# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JANE K. HARGADINE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. CIV-05-461-SPS |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| **Commissioner of the Social** ) | |
| **Security Administration,** ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

The claimant Jane Hargadine requests judicial review pursuant to 42 U.S.C. § 405(g) of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for benefits under the Social Security Act. The claimant appeals the decision of the Commissioner and asserts that the Administrative Law Judge ("ALJ") erred in determining that she was not disabled. For the reasons discussed below, the Commissioner's decision is REVERSED AND REMANDED.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . ." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act only "if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national

economy . . ." *Id*. § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[1]

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) to two inquiries: first, whether the decision is supported by substantial evidence; and second, whether the correct legal standards were applied. *Hawkins v. Chater*, 114 F.3d 1162, 1164 (10th Cir. 1997) [citation omitted]. The term substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). The court may not re-weigh the evidence nor substitute its discretion for that of the agency. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991). Nevertheless, the court must review the record as a whole, and "the substantiality of the evidence must take into account whether the

---

[1] Step one requires claimant to establish she is not engaged in substantial gainful activity, as defined by 20 C.F.R. §§ 404.1510, 416.910. Step two requires that claimant establish she has a medically severe impairment or combination of impairments that significantly limit her ability to do basic work activities. *See id*. §§ 404.1521, 416.921. If claimant is engaged in substantial gainful activity (step one) or if claimant's impairment is not medically severe (step two), disability benefits are denied. At step three, claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to step four, where claimant must establish that she does not retain the residual functional capacity (RFC) to perform her past relevant work. If claimant's step four burden is met, the burden shifts to the Commissioner to establish at step five that work exists in significant numbers in the national economy which claimant–taking into account her age, education, work experience, and RFC–can perform. Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

record detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias* 933 F.2d at 800-801.

**Claimant's Background**

The claimant was born on January 4, 1952, and was 53 years old at the most recent administrative hearing. She has a GED and previously worked as an assembly press operator, assembler, and parts washer. The claimant alleges she has been unable to work since April 14, 2001, because of a hypercoagulable state, severe headaches, seizure disorder, peripheral neuropathy, muscle atrophy, carpal tunnel syndrome, previous injuries to her feet and shoulders, degenerative arthritis and a bulging disc in the lumbar spine, fibromyalgia, insomnia, emphysema, pneumonia, bronchitis, stress urinary incontinence, depression, anxiety, bipolar disorder, and schizoaffective disorder.

**Procedural History**

On August 21, 2001, the claimant filed an application for disability benefits under Title II (42 U.S.C. § 401 *et seq*.). The application was denied. After a denial by the ALJ and the Appeals Council, the claimant appealed the decision to the United States District Court for the Eastern District of Oklahoma in Case Number CIV-03-564-SPS. On November 18, 2004, the district court remanded the case to the ALJ for further evaluation of a treating physician's opinion. During the pendency of her appeal, the claimant filed another application for disability benefits in June 2003. The claims were joined for adjudication and after a hearing on April 11, 2005, ALJ Michael Kirkpatrick found that the claimant was not disabled in a decision dated June 24, 2005. The Appeals Council denied review, so the

ALJ's decision represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. § 404.981.

## Decision of the Administrative Law Judge

The ALJ made his decision at step four of the sequential evaluation. He found that the claimant had the residual functional capacity ("RFC") to perform light work, *i. e.*, the claimant could lift and/or carry ten pounds frequently and 20 pounds occasionally and stand, walk and/or sit six hours in an eight-hour workday, with additional limitations: of only occasional climbing, stooping, crouching, kneeling, crawling, and reaching overhead with her non-dominate arm, but frequently fingering; no climbing of ladders, ropes, or scaffolds; avoiding hazards; and performing only simple routine tasks with incidental contact with others (Tr. 603). The ALJ concluded that the claimant could return to her past relevant work as an assembly press operator and assembler (Tr. 613).

## Review

The claimant argues that the ALJ erred: (i) by failing to properly evaluate the medical opinions from treating and examining physicians; (ii) by failing to discuss probative evidence; and, (iii) by making step four findings that were not supported by substantial evidence. In her first contention, the claimant argues that the ALJ failed to discuss the opinion of her treating physician Dr. Gary Engstrom, M.D., that she had limitations in prolonged standing and sitting, and the opinion from consulting physician Dr. Michael Irvin, D.O., that she was unable to grasp items such as tools for more than a few minutes with either hand. The Court finds these arguments persuasive.

The record reveals that the claimant was admitted to the Wadley Regional Medical Center in October 2002 complaining of flank pain and evaluated by Dr. Engstrom for hypercoagulable state. An MRI confirmed the presence of a renal vein thrombosis on the left. A standard hypercoagulability workup was done, and no identifiable cause of a hypercoagulable etiology was found. Dr. Engstrom, however, believed the claimant had a hypercoagulable state based on her clinical findings and her family history (Tr. 542-46). The claimant returned to see Dr. Engstrom in November 2002. She had again experienced flank pain with some hematuria, but it had resolved by the time of her appointment. Dr. Engstrom assessed the claimant with hypercoagulable state presenting as a left renal vein thrombosis and noted she was taking Warfarin (Tr. 490-91). In September 2003, the claimant was admitted to the St. Michael Health Care Center complaining of right calf pain. Dr. Engstrom noted that a Doppler ultrasound revealed an isolated acute thrombosis of the right posterior tibial vein. The claimant underwent treatment and when discharged her symptomatology had completely resolved, she was ambulatory, and she was feeling well and was stable for discharge (Tr. 711, 720-21). At her next visit in February 2004, the claimant had developed a new deep venous thrombosis in the left lower extremity. Dr. Engstrom's impression was that the claimant was suffering a recurrent thromboembolic event because of her hypercoagulable state. He noted her anticoagulation had been on the subtherapeutic side. He diagnosed her with hypercoagulable state not otherwise specified with a very strong family history and a history of three sites of deep venous thrombosis including the left renal vein, the right lower extremity, and the left lower extremity (Tr. 766). On the same day as

his examination, he indicated in a letter to another physician that the claimant had continued to show a propensity for developing deep venous thrombosis even with some degree of anticoagulation. He noted that the claimant should not perform a job function which would require her to stand on her feet for hours at a time, and if she were to perform a sedentary job, she would need to get up and ambulate frequently, because prolonged sitting could predispose her to developing blood clots (Tr. 765).

The claimant underwent a consultative examination with Dr. Irvin in February 2002. Her chief complaints were of migraines and fibromyalgia. According to the claimant, she experienced episodes when she could not write and sometimes dropped her glasses. Examination revealed circumference of 4/5 on the right arm and 3/5 on the left arm. Dr. Irvin noted some muscle atrophy in the thenar eminence on both the right and left hands, which was probably secondary to the claimant's carpal tunnel syndrome. The claimant had good sensation in both arms. She experienced some decreased range of motion in the left shoulder, but the right shoulder was within normal limits. She exhibited a positive Tinel's sign on both the right and left wrists and was positive for Phalen's test bilaterally. Although the claimant could effectively oppose thumb to fingertips and manipulate small objects, she was not able to grasp tools such as a hammer with either hand for more than a few minutes at a time (Tr. 414-20).

The record does not reflect whether the ALJ considered Dr. Engstrom to be one of the claimant's treating physicians.[2] Nor does it indicate any findings by the ALJ regarding Dr. Engstrom's opinion as to the claimant's limitations in standing and sitting because of her condition. If Dr. Engstrom *was* a treating physician, his opinions would be entitled to controlling weight if they were "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "consistent with other substantial evidence in the record." *See Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004), *quoting Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) [quotations omitted]. If for any reason Dr. Engstrom's opinions were not entitled to controlling weight, the ALJ would then be required to determine the proper weight to give them by analyzing *all of the factors* set forth in 20 C.F.R. § 404.1527. *Id.* at 1119 ("Even if a treating physician's opinion is not entitled to controlling weight, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in § 404.1527.'"), *quoting Watkins*, 350 F.3d at 1300 [quotation omitted]. Those factors include the following: (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (iii) the degree to which the physician's opinion is supported by relevant evidence; (iv) consistency between the opinion and the record as a whole; (v) whether or not

---

[2] With regard to her treatment by Dr. Engstrom, the claimant testified at the hearing that she saw Dr. Engstrom every 90 days for her problems with blood clots. She considered him one of her treating doctors (Tr. 1026-27).

the physician is a specialist in the area upon which an opinion is rendered; and (vi) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *Watkins,* 350 F.3d at 1300-01, *citing Drapeau v. Massanari,* 255 F.3d 1211, 1213 (10th Cir. 2001) [quotation omitted]. Finally, if the ALJ intended to reject Dr. Engstrom's opinion entirely, he was required to "give specific, legitimate reasons for doing so[,]" *id*. at 1301 [quotations omitted], so it is "clear to any subsequent reviewers the weight [he] gave to the treating source's medical opinion and the reasons for that weight." *Watkins*, 350 F.3d at 1300.

Thus, regardless whether Dr. Engstrom was in fact one of the claimant's treating physicians, the ALJ should have considered his opinion and explained his reasons for rejecting it. *See Hamlin v. Barnhart,* 365 F.3d 1208, 1215 (10th Cir. 2004) ("An ALJ must evaluate *every* medical opinion in the record, *see* 20 C.F.R. § 404.1527(d), although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional . . . An ALJ must also consider a series of specific factors in determining what weight to give *any* medical opinion."), *citing Goatcher v. Dep't of Health & Human Servs.,* 52 F.3d 288, 290 (10th Cir. 1995) [emphasis added]. Because he did not do this with respect to Dr. Engstrom's opinion about the claimant's limitations in standing and sitting, the ALJ committed error.

Further, the ALJ discussed *some* of the findings from Dr. Irvin's examination of the claimant, but he made no mention of Dr. Irvin's finding that the claimant had limitations in grasping objects. This finding seems particularly important, since the ALJ found the

claimant could return to her past work and her past jobs (as an assembly press operator and assembler) both required frequent handling. *See* DICOT §§ 690.685-014, 723.684-010. *See also Pettigrew v. Apfel*, 2000 WL 1363180, at *3 (10th Cir. Sept. 21, 2000) (noting that "handling activities" include gripping or grasping.) [unpublished opinion]. Although "an ALJ is not required to discuss every piece of evidence[,]" *Clifton v. Chater,* 79 F.3d 1007, 1010 (10th Cir.1996), *citing Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984), he "*must* discuss 'the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.'" *Hamlin,* 365 F.3d at 1215, *quoting Clifton,* 79 F.3d at 1010 [emphasis added]. Further, an ALJ may not "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence[,]" *see Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004), *citing Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984) ("[The] report is uncontradicted and the Secretary's attempt to use only the portions favorable to her position, while ignoring other parts, is improper."), which the ALJ appears to have done by adopting Dr. Irvin's finding as to fingering but not as to grasping. Clearly, the ALJ should have discussed Dr. Irvin's opinion on the claimant's grasping ability and explained his reasons for choosing to reject it. *See Threet v. Barnhart*, 353 F.3d 1185, 1190 (10th Cir. 2003) (remanding "for the ALJ to articulate specific findings and his reasons for ignoring . . . evidence."). *See also Hamlin*, 365 F.3d at 1215 ("An ALJ must evaluate every medical opinion in the record, . . . [and] consider a series of specific factors in determining what weight to give any medical opinion.") [citations omitted].

Consequently, the decision of the Commissioner must be reversed and the case remanded to the ALJ for a proper analysis of the above mentioned opinions expressed by Dr. Engstrom and Dr. Irvin. On remand, the ALJ should: (i) consider whether Dr. Engstrom is a treating physician and then apply the appropriate analysis to his opinion; (ii) determine whether the claimant has further functional limitations based on his analysis of these physicians' opinions, and if so, include them in the RFC; and, (iii) re-determine whether the claimant is disabled.

**Conclusion**

For the reasons set forth above, the ruling of the Commissioner of the Social Security Administration is REVERSED and REMANDED for further findings consistent with this Opinion and Order.

**DATED** this 30th day of March, 2007.

_____
**STEVEN P. SHREDER**
**UNITED STATES MAGISTRATE JUDGE**